May it please the court, Cal Potter on behalf of the Arce family. Knowing that the court is familiar with the facts of this case, I'd like to focus on why the court committed reversible error when he admitted the findings, or allowed the findings of the coroner's inquest to be brought in. In the case at hand, the plaintiffs were required to prove that Roberto Arce died as a result of the defendant's conduct. To do that and meet those elements, we had called the Clark County Medical Examiner, Dr. Donna Smith, and she had made a finding that the manner of death was homicide, that being the death occurring at the hands of the police officers involved. And that was the primary cause or the means was anoxic encephalopathy as a result of restraint asphyxia. During the time of the motion in limines, the court made a determination to allow this hearsay information in based upon a different type of analysis, that if in fact the statements were believed to be true, then they could be coming in. If indeed we wanted Dr. Smith to testify as to what her actual findings were, the error that occurs here that is prejudicial is that it allows, invades the province of the jury, allowing what is just rank hearsay from a nonjudicial proceeding to be brought in. If I may, because I don't have, I haven't got the entire trial record, was there any, you know, limiting instruction asked for or given? Your Honor, we, no there was not. What we had asked for was that it not be brought in at both phases, one at the time of the opening statements, but secondly at the time of the cross-examination. And the argument that was made at that point in time was that if she was going to testify as to a homicide, that in fact then she, they could bring in the other issues. Well, that's obviously what started the problem. I mean, it started every, started hitting the district court down the path of letting, letting us in. But let me, let me ask you something else. We have a line of authority that pertains to the admissibility of EEOC determinations in civil trials. And as I recall it, the law is basically that probable cause determinations can come in as a per se matter. But the letter of violation is admissible within the district court's discretion. And that's kind of similar. No other differences, but it's kind of similar. So how do you square your position with that line of case law? Your Honor, I'll be honest with you. I'm not really familiar with the EEOC, but I understand the principle you're talking about here. The historic prospect of a coroner's inquest that we cite to the old cases from Oregon, that is a nonjudicial proceeding. As a public policy matter, what occurs in Clark County, Nevada in these coroner's inquests, of course, is that neither party are involved. The police department is not involved. The city is not involved. And certainly the family is not involved. Instead, it's the district attorney that is there making the determination. The analogy we tried to make to the trial court was in California, a grand jury looks at this. Certainly the grand jury proceeding would not be brought forward in a trial. And that's really the analogous situation. More importantly ---- Did you have a chance or did you bring out ---- I don't even know how this thing came into evidence. I mean, did somebody just read it? Or did it just float in or ---- It was read in by the ---- in the opening statement. And then it was brought in through cross-examination of Dr. Smith. But what ---- In other words, she's asked, isn't it a fact that the coroner's inquest jury found the opposite of what you concluded? That's correct. And that isn't true. Factually, that isn't correct. Although there was a finding that it was excusable and that it was at the hands of the decedent himself or the actions of the decedent. That didn't impeach her determination as what she believed to be the cause of death. And so it's an improper impeachment also in that sense. But the ---- Well, an expert could have testified to precisely the same thing. It wouldn't have been a problem. The expert could have testified, but not as to the coroner's inquest. No, no, no. But an expert could have testified to the same bottom line. And what I want to impress upon the Court is the defense expert, the medical expert, Dr. Newman, testified as to that issue about what a homicide is. He said that's what pathologists do. Homicide just means death at the hands of another. Okay. So I had ---- what I was going to ask you is, was there any explanation in front of the jury about what the coroner's verdict means, how it's arrived at or anything like that? No. The coroner's ---- No. Just the verdict was read. Well, there was arguments about the testimony. There were other questions made to the ---- Was there any ---- did the jury know that the parties weren't present, how the verdict is arrived at or anything like that? No. There wasn't really a part of the ---- there would be a separate trial within the trial. Well, I'm not putting a spin on it. I was just asking a question, was there? And the answer is no. So then to me, the question becomes, let's suppose ---- I mean, assuming that there was error, we have to find that the error affected substantial rights. And even though there wasn't a limiting instruction given, the judge, no doubt as a matter of ordinary course, instructed that the jury is the judge of the facts. And the bottom line of the coroner's verdict was in the mix. I mean, it's ---- she testified to it, the medical examiner testified to it, Dr. Newman testified to it. So all the stuff was in there. So why in your judgment did that taint the verdict? Because it invades the province of the jury in the sense that they've already been told that the determination has been made. So did the EEOC determination letters. I mean, they definitely say there was discrimination. That's the bottom line that the jury has to find, and we have no trouble admitting those reports. And I would once again go to the fact that EEOC is a factual determination. The coroner's inquest ---- I think in those situations there's a rule of evidence. I think Rule 803.8c I think specifically allows public findings, you know, government reports, which this isn't, right? I mean, this is a lay group of people who essentially have reached a conclusion on, as you put it, a non-adversarial presentation. That's correct. And it becomes a very political, as a matter of public policy, those determinations become very political in the community. The district attorney is, although analogous to a grand jury proceeding, is not in a secret proceeding. They're generally a situation where they're trying to, for whatever reasons, reach particular determinations out of 122 coroner's inquests in Clark County. They've all either been justified or excusable. And I believe in the years that they've had, they've only had one that marked out and wrote negligent. They're not ---- there's no indice of reliability in making those determinations. All of that goes to error. All of that goes to error. My question was, how did it affect substantial rights? And you said because it invaded the province of Rhode Island. Right. And if, in fact, you allow those to come in as a matter of public policy or as a matter of law, then you give up the rights in terms of the civil rights determination. Historically, they had never been admitted in a civil rights proceeding in Clark County, Nevada. That's not the substantial rights question. I think the question that Judge Reimer is asking is, how did it hurt you? In other words, the evidence, you got the testimony in from your expert, the coroner. And yes, the coroner's inquest verdict was in there. How did it hurt you that the coroner's inquest verdict came in, given that everything else was in there, too? Because the jury is allowed to rely upon the determinations made by someone else. And I think that is the prejudice, when it invades the province of the jury. I would think that the problem, or at least part of the problem, is that you're not really in a position to try to effectively impeach the verdict of the coroner's jury, the inquest jury, because you'd have to sort of recreate that whole proceeding. Correct. And that's the argument. We'd have to retry the coroner's inquest process, which is a political process in nature. It's a process that we were not a part of. And so ---- I continue to say that's the reason to keep the thing out. Correct. But having come in, given the testimony of the medical examiner and given Dr. Newman's testimony, why is that reversible error? Because you have to find that it tainted the jury's verdict and it affected substantial rights. So that's what I'm trying to get from you. Given the mix in this case, given how this thing came in, given the use that was made of it, given how it was argued, why do you think it affected his substantial rights? And, Your Honor, I go back to what we were trying to do. Show that the Gandinis were the independent witnesses from across the street. They weren't asked all of the questions in the coroner's inquest about their observations. So we had to go back and make those same type of arguments. Because it is overwhelming error on the part in allowing that in, it allows them to assume that their determinations are insignificant. And I think it, one, changes the nature of the burden, changes the nature of the trial in terms of what took place. I'd like to also address some of those other issues that came into play. There was a motion in limine striking the prior incidents involving Roberto Arce where the police had been called. The court found that those would be prejudicial and ruled that they were not to be admitted. They likewise came in in the opening statement. So what's your understanding of the basis on which the district judge ultimately let that evidence in? I mean, there's several things that are argued, and I'm having a hard time figuring out what this particular basis was that the district court used to let the prior visits by the police in. Ultimately, he was stating if the officers had knowledge of it, then they would be able to testify if, in fact, they were the ones that had been involved in the prior incidents. But what was occurring was the police reports themselves were being read to the jury in the opening statement. And likewise, at the time of the, after the first day we had made the determinations and the judge had given us his rulings on the motion in limine, then they did the openings, then there was another sidebar concerning those same issues. That's when he said, well, if they were there, then they would come in. Was there an objection to the reading of the police reports in the opening statement? Yes, sir. And I move for a mistrial based upon the fact that they violated the order, the prior order of the court. There was also a reference, though, at some point, I think, to that your opponent was arguing that the prior visits were admissible because you were trying to paint a picture of the deceased as sort of a fine, upstanding man and that they were allowed to refute that. Do you understand that to be the basis or a basis or one of the bases on which the district court let that in? The district court made its determinations differently, Your Honor. And if you look at the record, the district court had its own basis for admitting and not admitting evidence. Initially, he did go through a prejudicial, like a 403 type analysis that it would be prejudice. Then he changed and said that, well, if, in fact, the officer's names were on the reports or if they were actually there and had some knowledge, then the argument was made that, well, these are going to come as impeachment. Clearly, what was occurring here was they were trying to assassinate the character of Mr. Arce and bring in these prior incidents to show that he was an individual that was not a worthy citizen to be bringing the type of action that was being brought. Well, you call it assassinating a character, but I guess the argument on the defense side was, yeah, and we're entitled to do that because you're trying to paint this different picture of him. So what's wrong with that argument, I guess, is my question. Well, the argument then comes into play as to who they're trying to impeach or whether they're trying to impeach the character. But what you have to look to is the context in which it occurred. It occurred in the opening statements during the time when he was actually reading the statements in violation of the court's order. And I would submit similarly on the third argument, we were denied the opportunity to prove an NL claim based upon the fact that there had been a prior positional fixia case. And what had occurred in that particular case was very similar. A lady dies under the influence of cocaine. And we were denied the opportunity to question the experts as to prior training. They were put on notice by the incident that occurred some three and a half years prior to the RC positional fixia case. And based upon that argument, we were denied the opportunity to try and prove the Menil claim. And I guess I've run out of time. Thank you, Mr. Clark. Thank you. Mr. Freeman. Thank you, Your Honors. May it please the Court. I'm Robert Freeman. I represent the appellees here in this case. So how is the coroner's inquest jury verdict not hearsay? I mean, it's an out-of-court statement about the cause of death. It was read. It's an official record. It was read from the official transcript. Nobody said that to the district judge. I mean, that's not what the argument was that was made. Excuse me? Nobody made that argument, but that's why it was admissible. It was this whole thing about impeachment. I mean, that was the argument. Well, I mean, look, admittedly, it's hard to tell what Judge Mahan was upon what basis he was holding. It's hard to tell what you were arguing, though, or you and your trial partner were arguing, and you didn't argue official record. I mean, you argued that it was admissible to impeach. I mean, that's like saying that, you know, that, you know, because Connelly said that that's not what the thing was, why the death was caused, that you can put in and out of, you know, my out-of-court statement to that effect. That's not what impeachment is. Impeachment is something that you've done, that you said, that the witnesses said. Well, the witness, you know, the witness experienced the reading of the verdict. She went and testified at the coroner's inquest. She heard the verdict. We asked her if that's the verdict that she heard. We read it from an official transcript. It doesn't make any less hearsay. Well, I think it's an exception. I think it's an official record. But that district, where in the record, where in the record of the trial was that argument made? Well, we didn't have to make that argument. Judge Mahan admitted the evidence is improper impeachment. He admitted it based on your contention that it was impeachment, not based on the contention that it was not hearsay. Well, it's not hearsay, and it was properly admitted for impeachment. So I don't know how to answer the question. We didn't get to that part of the argument because we didn't have to make that argument. Well, the problem with the official record thing is if you look at 8038, it's not just any official records admissible. It's any official records admissible, and there are various requirements about veracity and expertise and things like that. And that's why these EEOC findings come in, because that's a body that studies these things for a living, essentially. That's what they do. I mean, a coroner's inquest jury is just, you know, people who are summoned in for jury service. They hear evidence, and they make a decision. Well, and that seems to be a mixed question about whether it's hearsay or whether it's proper impeachment. And we took the – whatever you think about the admissibility of the coroner inquest investigation and process, whether you think it's admissible generally or you don't think it's admissible generally, we believe that in this case it was properly admitted. And let me ask you, what rule of evidence are you relying on today or did you rely on at the trial that would permit that to be admitted? Well, we proposed the impeachment. We were ready to do a 403 analysis. Apparently Judge Mahan did that 403 analysis. So your theory was that it was proper impeachment? Yes. Of what? But you didn't do a 403 analysis. Excuse me? He did not make a 403 analysis. Well, I mean, I take the position that the 403 analysis is implicit in his ruling. He determined that it was appropriate impeachment. Doesn't that mean that he believed it was more probative than prejudicial? No, it doesn't. I mean, something can be relevant and it can be, you know, whether or not it's impeachable as opposed to disimpeachment. And still, the prejudicial impact of it can way outweigh its probative value, which I would think is pretty clear in this case. Well, and that brings me to the point I was trying to make before. I mean, whatever you think about the admissible generally, because the plaintiffs used Donna Smith as their expert witness, they didn't have another expert witness to use. And because she was allowed to testify beyond what her findings were, she was allowed to give her opinion into a reasonable degree of medical probability on causation and on manner of death. Now, manner of death is a purely statutory, one of her purely statutory functions. That was first brought up by the plaintiffs in their opening statement. We proposed, and I think you know this, in Motions and Limiting prior to trial, we offered a compromise on that issue. We offered not to talk about the coroner verdict if they would just redact the report, take out the word homicide, and not ask her how she was going to describe the death, because we didn't want the jury to be confused by that word, which might mean something to others. But you could, I mean, that's an easy one to explain. I mean, that happens every day of the week. Homicide just means it's the death at the hands of another person. That's all it means. Okay. And judge, I'm confident that the doctor would have given that up to you in one question. And because that's true, if that's true, then the plaintiff should have accepted the compromise. Don't talk about homicide. Why does it have to be in the case? Their argument about Donna Smith having this statutory duty, she was performing her statutory function, and it's different standards and it's different policies and different rules. That's true. But that applies to everything that she did. That applies to her investigation of the circumstances of the death. It applies to her autopsy. It applies to the preparation of her report. It applies to the way she, the decision she made with causation and manner of death. It applies to her testimony at the inquest. And it applies to her satisfying and accepting the verdict of the coroner jury. So they want to allow her to talk about lots of things that are her statutory duties, but not let us talk about other things that were part of her statutory duties. Did she have a statutory duty? I thought I heard you just suggest that she has a statutory duty to accept the coroner's verdict? Well, they accepted the verdict at the end of the coroner inquest process. And that decides what happens next. So basically your position is that if a jury rejects the opinion of an expert, then you can bring in on cross-examination of the expert that the jury rejected the expert's opinion. Right? That's essentially your position. A hypothetical question? No. It's a concrete question. In this case, that if a jury rejects the opinion of an expert, which is what the coroner inquest jury did, then you can bring that in on cross of the expert to impeach the expert's testimony. Is that your position? Yeah. Okay. So here's my question to you. So in the defense case, when Dr. Newman got up on the stand and the plaintiff asked a question on cross, that isn't it a fact that you testified the same way in Ohio and the jury rejected your testimony? Your colleague made this sort of incredulous sounding objection. It wasn't even an objection. He says, oh, my gosh, Cal, how could you do that or something along those lines. So, I mean, you can't have it both ways. Well, I understand that. The judge sustained that objection as well he should have, frankly. You can't have it both ways. I mean, if an out-of-court finding by a jury rejecting an expert's opinion isn't admissible, it isn't admissible. Well, and I think that that's the point I'm trying to make. Whatever you think of it generally, in this case, because of the use that was put to this doctor, she was, you know, we argued before trial that she wasn't qualified to be an expert witness for all the reasons that are in our brief. The use they put to her, though, they used her as an expert witness, and she went beyond just talking about what the cause of death was. She talked about the manner of death. And whatever you think of that word, that was our response to that word, homicide. We didn't want the jury thinking, you know, in the middle of the opening statement, hey, why aren't those police officers in jail? Are you arguing that you were entitled to use admissible evidence because the plaintiff presented evidence that should not have been presented? Well, and I think that's exactly what Judge Mahan said. They're going to use her in this way. They're going to open the door to this evidence. Then you get to impeach her with the coroner jury verdict. Now, usually when you use the term impeach, it's because of a prior inconsistent statement. Was there a prior inconsistent statement? No. What was the impeaching factor here that you're relying on? That her opinions were not accepted by this other governing body, this other body. But that sounds like hearsay, doesn't it? Well, we didn't get to that argument. I would have made it at that time that it was an exception to hearsay. So talk about the, if you wouldn't mind, talk about the admissibility of the prior incidents. So I have the same question for you that I asked your opponent. What's the basis on which the district court ended up letting in the prior visits, the six or eight or however many it was, prior visits by the police to the RCA's home? Well, I think it was two things, Your Honor. I mean, one thing is the officers did have knowledge about prior events. Which officers? I mean, the only testimony that you put in, that your side put in during the trial came from two officers, and they talked about two specific incidents that had occurred in January three or four months earlier, not the whole parade of things that was read verbatim in the opening statement. Well, the officers, Officers Hoyt, Officers Skidworth, and Officer Cardinale all knew about prior incidents, whether they were, whether they specifically experienced them by being there. I didn't elicit that. I mean, the only thing that was elicited. I think we did. In the record, the only thing that was elicited in terms of knowledge of the officers who were claimed to have done, who were claimed to have caused the deaths, the only thing that was elicited was these two incidents. It was on Skidworth. There was an incident in January of 2002. It said he was aware of one prior incident where the police had a fight with him. That's right after page 980 of the excerpts of the record. And then there's another officer, I think a little bit later on, that talks about two incidents in the same month, January. I mean, there wasn't anything other than that. Well, Officer Cardinale also, Your Honor, and I think maybe your confusion is my fault. I noticed when I was getting ready for this hearing that when I was describing Officer Cardinale's experience, that I had miscited it. I had cited it as page 1016 of the record, and it should be 1026 of the record. But beyond that, it's pretty clear on a ---- That's 1026. That's before the trial started. That's the argument on the motions in Lemonade, isn't it? I'm talking about the excerpts of the record citations. Yeah, let me make sure that I have it. The way this thing worked is that day one actually starts at page 1,000 and something, and then day two starts at 900. It's kind of all backwards. I mean, I know that there was a lot of commentary to the judge during the argument on the motions in Lemonade right before the opening. And during the opening, there was a lot of commentary about, well, the officers knew this. The officers knew this. What I'm talking about is what actually got put in as to what the officers knew. And I'm just not seeing it, other than you said. Well, you're pointing out the three officers. There are three officers that said they knew about prior incidents. The judge also allowed us to use it to impeach this notion that Mr. Arce was this upstanding family man with a minor drug problem that caused him to be introspective but not violent. And that's it in the record at 1077 and 1078. But the only way any of that gets in is just by you reading off these police reports, though. I mean, that's... We impeached each family member. Each family member was forced to admit that they had made prior calls. That I understand. That's not what I'm talking about. Okay. I mean, you know, the questions are asked of the wife and the mother and the brother and the sister, whatever, saying isn't it a fact that people came out to the house. I understand that. What I'm talking about is the reading verbatim, an opening statement. At least it seems like it's verbatim of these police reports, kind of one after the other. It's really the centerpiece and the bulk of the opening statement. And the question is... The question is, I mean, you didn't get any of that out of the people you're talking about that you crossed. What you got out of the wife and the mother and so on is that, yeah, the police came out to the house. No. I mean, I think there were specific police records that were read by Joanna Romo during her testimony that refreshed her recollection about certain events. One event where Roberto Arce pulled the phone out of the wall and threw it at her. One event where she was actually pushed down. She ended up admitting that those actually occurred. And those were responses to her calls. I'm happy to talk about that. So how is that admissible? I'm having a hard time. Okay. It's admissible in my view to impeach this notion that all of these family witnesses testified to a person... They described Roberto Arce totally differently than what the police records describe him as. So it impeaches that. They said he was a family man, peaceful, minor drug problem. He did not... His wife said he didn't get violent when he got high. His wife said he became introspective and would go off by himself. Now, that's belied by the record. The record is that they had to call the police all the time. David Arce told us on direct examination, told the jury on direct examination, that his brother was the foundation of the family. He was a great guy. He was forced to admit on cross-examination that on two times he had to call the police one time because Roberto was trying to kill him. Odelia Arce admitted that she was there on that particular occasion when Roberto tried to kill his brother. So Grace, the same thing. Grace came in and said he was a great guy. He was a good role model. But she was forced to admit that she's the one who made the 911 call on the night of the incident. And she went through in detail all of the things that were done to protect her and her siblings from Roberto Arce. The Parker case, the other third line, third ground for appeal, I think is the easiest one, obviously. Parker was a 1998 case that was resolved in favor of the city. It was resolved on motion for summary judgment and appeal to the 9th Circuit. The order, which we've given you in the record, showed that the 9th Circuit found that the officers didn't exercise any excessive force as a matter of law. Because of that, it wasn't relevant on a Monell issue as an unconstitutional policy or even a training issue. So I think the Court properly kept it out. Okay. Thank you. Mr. Freeman? Mr. Parker, do you have anything to add in short order? Yeah. I would just state that Dr. Smith was the only pathologist. The other doctor was not a pathologist. That's the reason she was used. She was the one that made the determinations. I want to ask you just one quick question. Yes, sir. I apologize. Your opponent said that on the prior incidents that that was admissible because the family members had gotten up on the stand and said he's not violent and so on and so forth. And so it was proper to bring in through the cross of them that they had previously called the police complaining that he was scary and violent and so on. What about that? Well, it went beyond what they were talking about. Clearly what they were trying to do was bring in the prior incidents in and of themselves. The questions that were being asked, you know, they're talking about their experiences with Roberto Arce. He was the head of the family. He was gainfully employed. He did do all these things. Now, had he been called? Had the police been called? Yes, they had. Had some of the individuals made the calls? Yes. But they didn't go. They didn't have the knowledge that was read to the jury in the police reports. The police reports were read verbatim and clearly the judge stopped it at that point in time. But they went back to and that was in violation of the prior order on the motion. And then they went back and tried to flush in everything. Thank you very much. Okay. Thank you, counsel. The matter of historicity will be submitted and the court stands adjourned for the session.
judges: Kennelly, Alarcon, Rymer